IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2013 Session

IN RE ESTATE OF JANE KATHRYN ROSS

Appeal from the Probate Court for Davidson County
No. 10P1253    David Randall Kennedy, Judge

No. M2012-02228-COA-R3-CV - Filed June 27, 2013

The trial court decreed a resulting trust in a house paid for by the decedent on property owned by her son. We have concluded that the trial court erred.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, M.S., P.J., and FRANK G. CLEMENT, JR., J., joined.

James G. Stranch and Michael J. Wall, Nashville, Tennessee, for the appellant, Paul T. Sorace.

Eugene N. Bulso, Jr. and Steven A. Nieters, Nashville, Tennessee for the appellee, the Estate of Jane Kathryn Ross.

OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Jane Kathryn Ross was the mother of Paul Sorace and Joan Wildasin. In June 1991, Mr. Sorace purchased property on Old Charlotte Pike in Pegram, Tennessee consisting of about seven acres with a small farmhouse. In 1998, Ms. Ross executed a will that left most of her estate to her two children in equal portions. Ms. Ross executed a durable power of attorney to Ms. Wildasin in 2000.

In 2004, Ms. Ross was living in a house she owned on Golf Club Lane in Nashville. Mr. Sorace was living in the small farmhouse in Pegram. Although the precise nature of their arrangement is in dispute, Ms. Ross and Mr. Sorace agreed that she would build a home on the Old Charlotte Pike property and they would live there together.

On June 29, 2005, Ms. Ross sold her house on Golf Club Lane; she made a net gain of $395,719 on this sale. She moved into the farmhouse with Mr. Sorace and, on July 6, 2005, she and Mr. Sorace signed a construction contract to build a new house on the Old Charlotte Pike property. Ms. Ross and Mr. Sorace both signed the construction contract as owners. By the time the project was completed in June 2006, Ms. Ross paid a total of $433,064.68 to construct the new home; Mr. Sorace contributed $15,979.16 in expenses related to the new house.

Paul Sorace, until then a bachelor, married Kacie Cheshire Sorace in April 2007. Ms. Sorace had a five-year-old son from a previous relationship, and Paul and Kacie later had twin sons. The Sorace family lived together with Ms. Ross in the home on Old Charlotte Pike. Ms. Ross was not happy about Mr. Sorace's marriage. Moreover, her mental capacity was declining.

In March 2009, Ms. Wildasin, acting as her mother's next friend, filed suit against Mr. Sorace in chancery court to establish a constructive trust and for partition and damages. After Ms. Ross's death in April 2010, her estate was substituted as plaintiff and the case was transferred to probate court. In a first amended complaint, the estate sued Mr. Sorace and his wife and asserted claims for a resulting trust, a constructive trust, unjust enrichment, rent, conversion and financial exploitation, and violation of the Adult Protection Act.

*The trial*

The case was tried over several days in August 2012. Mary Campbell, the first witness for the estate, was a friend of Ms. Ross for about ten years. Ms. Campbell testified that Ms. Ross told her about a plan to build a house on Paul Sorace's land and to live there with him. While the house was under construction, Ms. Ross told Ms. Campbell that she was "on the deed" for the new property. After Ms. Campbell's husband did some research and discovered that Ms. Ross was not named on the deed, Ms. Ross responded: "That couldn't be right." Mary Campbell's husband, Bobby Campbell, testified that he had found out that the house was in Mr. Sorace's name, but he could not recall Ms. Ross's reaction.

Ida Forte, a friend of Ms. Ross from nursing school, testified that Ms. Ross referred to the new house as "my house." She recounted taking Ms. Ross to a reunion in June 2008, after Ms. Ross had been diagnosed with Alzheimer's; she observed that Ms. Ross was careful about what she said and did not seem to be forgetful.

Adrienne Newman, a social worker who worked with Ms. Ross for about 18 months beginning in early 2000, testified that, in February 2007, Ms. Wildasin asked her to talk to Ms. Ross. When she spoke with Ms. Ross, Ms. Ross asked Ms. Newman to accompany her

to see an attorney, John Wagster, to discuss concerns about the new house. Ms. Ross told the attorney that she was concerned about whether her name was on the deed to the property and how she could protect her interests in the event that she no longer lived there (because of Mr. Sorace's marriage). On cross-examination, Ms. Newman testified that Ms. Ross told her that she was postponing taking any action on the attorney's advice because of concerns about her son's welfare during a turbulent time before his marriage.

Portions of the deposition testimony of Dr. William Marshall Petrie, a geriatric psychiatrist, were presented by the estate. Dr. Petrie began treating Ms. Ross in May 2008. He testified that, at that time, Ms. Ross had dementia of the Alzheimer's type and was "at the severe level of impairment." Ms. Ross was disoriented and confused and exhibited psychotic symptoms. When asked when he thought Ms. Ross's cognitive decline likely began, Dr. Petrie opined that "her cognitive decline probably began about four years ago, . . . that a careful observer would have been able to notice it four years ago," or mid-2004. Dr. Petrie acknowledged that he could not give an opinion to a reasonable degree of medical certainty as to when Ms. Ross lost her mental capacity.

Joan Wildasin, Ms. Ross's daughter, testified that her mother stated that "Paul owned the land but she would own the house." Ms. Wildasin further testified about her mother's state of mind regarding the new house in the fall of 2005:

> A. . . . [Ms. Ross] was very upset about things not going as planned. The house was costing more than she thought, the contractors were not doing their job properly, and she was very upset about that. More than that, she became quite upset because, at some point, she told me that Paul had informed her that she didn't own the house, that there was no such thing as a title to a house, that because it was on his land, he owned it.
>
> Q. What was your mother's reaction to Mr. Sorace's position that he owned the house because it was on his land?
>
> A. She didn't understand that. She asked me, "I paid for it. I own it. Right?"

Ms. Wildasin testified that she advised her mother to talk to an attorney or ask Mr. Sorace to put her name on the title. Ms. Ross later informed Ms. Wildasin that she had talked to Mr. Sorace and that he agreed to put her name on the title to the property. Over Christmas in 2005, while the house was still under construction, Ms. Wildasin visited her family in Nashville; Ms. Ross told her that Mr. Sorace had not put her name on the deed. Ms. Wildasin spoke with Mr. Sorace:

I asked him if he had put her name on the deed, and he said, "Nope, not going to do that yet." And I said, "Okay. Why not?" And he said that she had been balking at all the cost overruns and he was afraid that she was not going to finish the construction. And that when the construction was finished and she had done what she said she was going to do, then he could put her name on the deed.

Ms. Wildasin testified that she relayed this information to her mother.

Ms. Wildasin further testified that, during 2006, she asked her mother whether Mr. Sorace had put her name on the deed. Ms. Ross checked with Mr. Sorace and then told her daughter that he was refusing to put her name on the deed. Sometime around January 2007, Ms. Wildasin testified, she spoke with her brother about his upcoming marriage and asked about the deed again. He assured her that he was going to see an attorney soon and get his mother's name put on the deed.

According to Ms. Wildasin, Ms. Ross decided not to follow through on the advice she received from the attorney because Mr. Sorace was about to get married and she "was afraid to do anything because she didn't want to push Paul over the edge." Ms. Ross was worried about Mr. Sorace because of an incident when he became upset and disappeared for a few days.

By July 2008, Ms. Wildasin testified, Ms. Ross was not capable of talking intelligently about the house deed. In November 2008, Ms. Wildasin moved Ms. Ross to California to live with her.

Rachel McDonald, a realtor, testified for the defendants. She listed Ms. Ross's house on Golf Club Lane for sale in April 2005. Ms. McDonald described Ms. Ross as "very intelligent" and "strong-willed" at that time; she believed that Ms. Ross negotiated a fair price for the house. Ms. McDonald testified that she did not observe any kind of mental impairment on Ms. Ross's part.

Kerry Bissinger had worked with John Sorace, Ms. Ross's ex-husband, in the police department. She testified that Ms. Ross told her that she wanted to build a house for Paul Sorace and that it would be her gift to him. On cross-examination, Ms. Bissinger stated that an arrangement where Mr. Sorace would get the house after Ms. Ross's death would be consistent with what Ms. Ross told her.

Alice Pickney, a friend of Ms. Ross from church for at least ten years, testified about statements Ms. Ross made to her about the new house. She wanted her son to have a house

and referred to it as her son's house.

The next witness, Monica Jett, had known Ms. Ross and the Sorace family since she was a child. According to Ms. Jett, Ms. Ross stated that she wanted to build the house for her son and that she wanted him to have the house. Ms. Jett stated that Ms. Ross intended for Mr. Sorace to own the house. On cross-examination, Ms. Jett stated that she had worked in the police department with John Sorace.

Lydia Grisham met Ms. Ross when she moved in with Paul Sorace in Pegram. Paul Sorace was a friend of Ms. Grisham's husband from the police department. Ms. Grisham lived about a quarter of a mile away from Mr. Sorace's house. Ms. Ross told Ms. Grisham that the new house "was going to be Paul's inheritance." According to Ms. Grisham, Ms. Ross wanted Mr. Sorace to have the house to make up for everything she had done for Ms.Wildasin "and she wasn't there for Paul."[1] She and Ms. Ross never talked about the legal aspects of the ownership of the house.

The defendants read into the record portions of the deposition of Dr. Cecilia Fisher, the internal medicine physician who began treating Ms. Ross in April 2004 and saw her every three or four months thereafter. At the initial appointment in April 2004, Ms. Ross was given the Mini Mental Status Exam, a screening instrument for dementia; Ms. Ross made a perfect score and showed no signs of cognitive problems. Dr. Fisher opined that, as of September 2005, Ms. Ross's judgment was intact. Another doctor, Dr. Fallis, diagnosed Ms. Ross with Alzheimer's disease in November 2007. Dr. Fisher opined that Ms. Ross's cognitive decline was mild at first but had become worse by November 2007.

John Sorace, father of Paul Sorace and former husband of Ms. Ross, testified that Ms. Ross said that she wanted to give the new house to Paul as a gift. He stated that Ms. Ross expressed this intention several years before the house was actually built.

Paul Sorace took the stand and testified that he heard his sister ask what inheritance she was going to get from both parents. He denied telling anyone that he would put his mother's name on the deed to the property on Old Charlotte Pike or that he would give her an ownership interest. Mr. Sorace admitted that, in April 2010, he had borrowed $241,000 against the property.

In rebuttal, Ms. Wildasin presented audio tapes of telephone messages left for her by her mother in April and June 2007 indicating that Ms. Ross was not happy living with Mr.

---

[1]Kathryn Ross and John Sorace divorced when their children were young; Kathryn lived with her mother, and Paul lived with his paternal grandparents next door to his father.

Sorace and wanted to move.

*Decision of trial court*

The trial court entered a decree on September 4, 2012 in which it concluded that the house built at 8745 Old Charlotte Pike was erected and paid for by Ms. Ross, that "the house was erected thereon in trust, such that an equitable title to said house resulted to the decedent, that she had the right to have legal title to said house," and that the estate had succeeded to that right. The court ordered that Paul Sorace's right "to the use, possession, and enjoyment of the house at issue in this matter be . . . divested out of the defendant" and that an easement be vested in the estate "entitling it both to the sole right to occupy, possess, and enjoy the house . . . as well to the right of ingress and egress thereto across the gravel driveway that exits onto Old Charlotte Pike."

In its order, the trial court incorporated the reasoning stated by the court at the final day of the hearing on August 15, 2012. All claims against Kacie Sorace were dismissed at the end of the trial. The court identified the central issue to be whether Ms. Ross made a gift of the house to her son, Mr. Sorace. The court reviewed the testimony given by the various witnesses. With respect to Mary Campbell's testimony, the court stated: "It's undisputed that [Ms. Ross] made an expression to a disinterested witness [Ms. Campbell] that she believed this property to be property she held an ownership interest in, at least at the time she made the statement." According to the testimony of Adrienne Newman, characterized by the court as "another disinterested witness," Ms. Ross informed an attorney with whom she met that she was building the house for herself and her son to live in.

With regard to the testimony about Ms. Ross's mental competency, the court stated that "by May of 2008 Ms. Ross was clearly demented, severely impaired, had considerable psychotic symptoms of anxiety, fearfulness, and paranoia, and in fact, she confused her son, Paul, with her [deceased] husband." Although Dr. Petrie opined that Ms. Ross's cognitive decline probably began in 2004, Dr. Fisher's testimony "suggests that in '04 and '05 [Ms. Ross] still had capacity." The court reached the following conclusion: "The court, as it relates to events [in] '04 and '05, does not find that [Ms. Ross] lacked the capacity to engage in the conduct that she engaged in or to make the decisions that she made in entering into transactions that may have resulted in the construction of this property."

The court further concluded that, "at the time she entered into this contract [to build the new house], it is more than reasonable to conclude that [Ms. Ross] believed she was indeed an owner of that which was about to be constructed and for which she was about to invest all of the proceeds from the sale of her home at Golf Club Lane." The court noted the testimony of Ms. Wildasin that her brother, Mr. Sorace, "promised his sister that he would

put Mom's name on the deed after completion."

The trial court found the testimony of John Sorace, the father of Paul Sorace, to be "not credible." The court specifically cited the fact that John Sorace borrowed money from Ms. Ross, his ex-wife, during the time when she was suffering from dementia. The court found the testimony of Ms. Wildasin "substantially more credible, more believable, more understandable, more coherent than does the Court find the testimony of Mr. [John] Sorace."

Looking at the testimony of disinterested witnesses who testified on behalf of Paul Sorace, the court concluded that the intent expressed by Ms. Ross to those persons was "to make a future conveyance," "a future transaction that one would contemplate someone might deal with in their last will and testament." But, the court found, Ms. Ross did not carry out the intent to leave the property to her son upon her death and did not make delivery as necessary for an inter vivos gift. In imposing a resulting trust, the court reasoned as follows:

> Now, based on all the elements that were presented by the plaintiffs, not the least of which was the proclamation by the decedent that, "Paul will own the land and I will own the house," coupled with the failure to file a gift tax return, there being no written evidence of a gift, the meeting with Attorney Wagster, the discussions regarding the deed, and the entire record in this court, the Court finds that [a] resulting trust shall be imposed upon this property.

*Issues on appeal*

Mr. Sorace argues that the trial court erred in awarding the estate a resulting trust in his realty because Ms. Ross did not pay for the initial purchase of the property. He further asserts that the estate failed to prove its case for a resulting trust by the requisite standard of proof.

STANDARD OF REVIEW

Our review of the trial court's findings of fact is de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn.1999). We "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007).

ANALYSIS

This appeal requires us to consider the precise nature of the equitable remedy of a resulting trust. The appellant, Mr. Sorace, argues that the trial court erred in decreeing a resulting trust in this case because Ms. Ross did not supply the consideration for his initial purchase of the real property at issue. The estate asserts that the concept of a resulting trust is flexible and sufficiently broad to allow the remedy ordered by the trial court.

This court has previously cited with approval the following principles regarding resulting trusts:

> Resulting trusts are those which arise where the legal estate is disposed of, or acquired, without bad faith, and under such circumstances that Equity infers or assumes that the beneficial interest in said estate is not to go with the legal title. These trusts are sometimes called *presumptive* trusts, because the law presumes them to be intended by the parties from the nature and character of their transactions. They are, however, generally called *resulting* trusts, because the trust is the result which Equity attaches to the particular transaction.
>
> Resulting trusts arise: (1) When property is conveyed, or devised, on some trust which fails, in whole or in part; (2) When land is conveyed to a stranger without any consideration, and without any use, or trust, declared; (3) Where the property is purchased and the title taken in the name of one person, but the purchase price is paid by another; and (4) Where the purchaser pays for the land but takes the title, in whole or in part, in the name of another.
>
> A resulting trust will be decreed when necessary to prevent a failure of justice, and the equitable power to do so applies with respect to both real and personal property. It is generally proved by parol evidence, but the testimony must be clear and convincing. A mere preponderance is not enough.

Henry R. Gibson, GIBSON'S SUITS IN CHANCERY § 26.05 (8th ed. 2008) (footnotes omitted); *see Cherry v. Cherry*, No. W2007-00122-COA-R3-CV, 2007 WL 3072747, at *4-5 (Tenn. Ct. App. Oct. 23, 2007); *Smalling v. Terrell*, 943 S.W.2d 397, 400 (Tenn. Ct. App. 1996); *Estate of Wardell ex rel. Wardell v. Dailey*, 674 S.W.2d 293, 295 (Tenn. Ct. App. 1983).

As this court has recognized, "the underlying principle of all resulting trusts is the equitable theory of consideration." *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980) (quoting *Greene v. Greene*, 272 S.W.2d 483, 487 (Tenn. Ct. App. 1954)). This theory has been summarized as follows:

That theory is that the payment of a valuable consideration draws to it the beneficial ownership; that a trust follows or goes with the real consideration, or results to him from whom the consideration actually comes; that the owner of the money that pays for the property should be the owner of the property. . . . In order that this effect may be produced, however, it is absolutely indispensable that the payment should be actually made by the beneficiary . . . or that an absolute obligation to pay should be incurred by him, as a part of the original transaction of purchase, at or before the time of the conveyance; *no subsequent and entirely independent conduct, intervention, or payment on his part would raise any resulting trust.*

*Id.* (quoting *Greene*, 272 S.W.2d at 487) (emphasis added); *see also Smalling*, 943 S.W.2d at 400. Thus, "the trust must arise out of the state of facts existing at the time of the purchase, and attach to the title at that time, and not arise out of any subsequent contract or transaction." *McClure v. Doak*, 65 Tenn. (6 Baxt.) 364, 369 (1873); *see also Smalling*, 943 S.W.2d at 400; *Livesay*, 611 S.W.2d at 584.

With respect to a resulting trust in land based upon the source of the consideration–sometimes called a "purchase money resulting trust"–the law requires that the trust arise at the time of the conveyance of the property. *See McClure*, 65 Tenn. at 369; *Smalling*, 943 S.W.2d at 400; *see also* Ronald Chester, George Gleason Bogert & George Taylor Bogert, THE LAW OF TRUSTS AND TRUSTEES § 456 (3rd ed. 2012). In arguing against this rule, the estate cites broad language from the case of *In re Estate of Nichols*, 856 S.W.2d 397 (Tenn. 1993). The Court in *Estate of Nichols* quoted language from a treatise setting forth the two main circumstances in which a resulting trust may arise (a failed express trust or a purchase money resulting trust) and going on to state that resulting trusts "may also be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust–on an inquiry into the consideration of a transaction–in order to prevent a failure of justice." *Estate of Nichols*, 856 S.W.2d at 401 (quoting 76 AM.JUR.2D *Trusts* § 166). The *Estate of Nichols* case did not involve a purchase money resulting trust; rather, the issue in that case was the ownership of certificates of deposit held as joint tenants with right of survivorship. *Id.* at 398. We do not interpret the language relied upon by the estate in the present case to eliminate or change the traditional rules with respect to resulting trusts in land transactions.

In accordance with the general rule discussed above, our courts have generally denied resulting trusts based upon improvements to real property. *See In re Estate of Jones*, 183 S.W.3d 372, 379 (Tenn. Ct. App. 2005); *Estate of Queener v. Helton*, 119 S.W.3d 682, 687 (Tenn. Ct. App. 2003); *Smalling*, 943 S.W.2d at 402; *Rowlett v. Guthrie*, 867 S.W.2d 732, 735 (Tenn. Ct. App. 1993). These decisions are consistent with the principle of real property

law that buildings erected on land generally become part of the real property and are conveyed with the land. *See Dudzick v. Lewis*, 133 S.W.2d 496, 497 (Tenn. 1939).

The estate emphasizes the case of *Lowe v. Cannon*, No. 02A01-9707-CH-00147, 1998 WL 161069 (Tenn. Ct. App. Apr. 8, 1998), as being factually similar to the present case, but we find the case to be distinguishable. In *Lowe*, the plaintiff conveyed five acres of her land to her brother and his wife. *Lowe*, 1998 WL 161069, at *1. Although there was conflicting testimony regarding the amount of consideration paid by the brother, the plaintiff (in whose favor the court imposed a resulting trust) testified that she received no consideration in this transaction. *Id.* The plaintiff further testified that she paid $74,420 for the construction of a house on the property and that she and her brother agreed that she would be able to live in an apartment there for the rest of her life. *Id.* at *1, 3. The trial court found that the plaintiff had established the existence of a resulting trust in the apartment, and this court affirmed that result. *Id.* at *2-3. In *Lowe*, unlike in the present case, the plaintiff arguably acquired a resulting trust at the time when she conveyed the real property to her brother for little or no consideration. *See Harvell v. Williams*, No. 01A01-9706-CH-00258, 1998 WL 9349, at *1-2 (Tenn. Ct. App. Jan. 14, 1998). Moreover, to the extent that *Lowe* is inconsistent with our analysis in the present case, we consider it to be at odds with the weight of precedent.[2]

We acknowledge that the result we have reached here is less than satisfying. Under the law of resulting trusts, however, we must conclude that it is the proper result. Mr. Sorace bought the real property in June 1991 and was the sole owner. By deciding to build a house on property owned by her son, Ms. Ross increased the value of Mr. Sorace's property. But the deed for the property still shows Mr. Sorace to be the sole owner, and the law of resulting trusts does not permit a court to declare such a trust based on improvements to real property.

---

[2]Other cases cited by the estate are likewise inapposite. In *Estate of Queener*, 119 S.W.3d at 687, this court reversed the trial court's resulting trust in favor of Ms. Helton because she did not provide any consideration at the time when the decedent acquired the property. The claim emphasized by the estate in the present case is that of Ms. Kelley, who testified that she and her family moved into a small house on the decedent's property, helped him take care of the property, made improvements, and helped care for the decedent's ailing mother. *Id.* at 688. Ms. Kelley and her son further testified that the decedent "promised that the house would be hers, and that she thus expected to receive some further compensation." *Id.* The trial court's award to Ms. Kelley, affirmed by this court, was based upon quantum meruit or an implied contract, not on a resulting trust theory. *Id.*

*Cherry v. Cherry*, too, is distinguishable from the present case because it involved a resulting trust created when one brother (Mickey) conveyed his interest in property to another brother (Bobby) without consideration; there was evidence to support the trial court's conclusion that Mickey intended Bobby to hold the property in trust for him and his family. *Cherry*, 2007 WL 3072747, at *5. The resulting trust in *Cherry* was implied from the absence of consideration and other circumstances and was not a purchase money resulting trust.

CONCLUSION

The judgment of the trial court is reversed. The costs of appeal are assessed against the estate of Ms. Ross, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE